CLOSED

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JEROME PASTVA, | : : : : : : : : : : : | Civil Action No. 11-cv-05176 (PGS)<br><br>MEMORANDUM AND ORDER |
| Plaintiff, |
| v. |
| COMMISSIONER OF SOCIAL SECURITY, |
| Defendant. |

This matter is before the Court upon the appeal of Plaintiff, Jerome Pastva ("Plaintiff" or "Pastva") from the Commissioner of Social Security Administration's final decision denying his application for Disability Insurance Benefits. Plaintiff filed an application for Supplemental Security Income Benefits on December 20, 2005. Evidently, the claimant filed an "untimely" request for a hearing with a statement for good cause which was granted. Thereafter, Plaintiff appeared at a hearing on July 2, 2008 before Administrative Law Judge (ALJ) Donna A. Krappa. Following that hearing, written interrogatories were sent for consideration and response to Martin A. Fechner, M.D., a medical expert. In addition, a supplemental hearing was held on February 11, 2009 wherein both Dr. Fechner and Rocca J. Meola, a vocational expert, testified.

1

I.

Mr. Pastva is a 57 year old man who is a widower, and has one son living in Texas. Mr. Pastva has a Bachelor of Art's degree in pharmacology, and has past work experience as a pharmacist in a hospital. He also has past work experience as a self-employed electrical contractor. In the 1980s[1], Pastva was involved in a car accident, and thereafter was prescribed narcotic pain medication and became addicted to them. At some point in time, he overdosed on pain killers at the hospital where he worked as a pharmacist, and thereafter was fired from his job. After he was fired from this job, he returned to work as an electrician.

In August 1988, his wife of eleven years was hit by a garbage truck and was killed on impact. After that time Mr. Pastva was raising his son alone, became very depressed, and subsequently became an alcoholic. He describes his depression as numbing, lasting days at a time. In addition to depression, he also suffers from post-traumatic stress disorder, and he has difficulty sleeping due to nightmares. He testified that he sometimes wakes up screaming with recurring nightmares of his wife's death, and the deaths of his mother and father, and then cannot fall back asleep. The nightmare episodes make him nervous about falling asleep and he only sleeps three to four hours at a time. He indicated that he suffers from "hopelessness, fear, loneliness".

At the supplemental hearing on July 2, 2008, Plaintiff testified on his own behalf. At that time he was coherent, and could comprehend the questions posed. Plaintiff testified about his living arrangements and described his life between 1990 and 1996 when he was unemployed and raising

---

[1] When this event occurred is not clearly set forth in the record. Mr. Alter's brief infers it occurred in 1988 but other documents indicate it may have happened later. Since the relevant impairments are as of December, 2005, the timing of the incident does not need to be determined except that it underscores Pastva's tragic life.

his son through the use of his wife's death benefits. He testified that his past work experience as an electrical contractor required him to lift a maximum of 60 to 70 pounds, and frequently lift 20 pounds. Plaintiff testified that between 2002 and 2005 he worked part-time for Labor Ready Northeast, but stopped in 2005 due to heart problems. It was his testimony that he cannot work due to walking and breathing problems, and that he routinely uses an inhaler and often stops and sit down due to breathing issues. He testified that he also carries nitro glycerin tablets for his heart, which he uses about once a week. He also testified that "back pain also can get me" and he can only walk two blocks. He finds carrying garbage is difficult and washing laundry is a whole-day project. He testified that because of his depression, he sometimes he cannot even make it to the shower and just sits down and stares at the wall because he has no drive. With regard to his alcoholism, Plaintiff testified that the last time he drank was Christmas time (December 2007). He testified that he was receiving psychiatric treatment until fall of October of 2007, but has ceased such treatment, and currently takes Ativan to help him stop drinking. Plaintiff testified that he has not used cocaine or narcotics for about four to five years. Socially, he is very isolated and almost agoraphobic. He showers irregularly, and he does not shave because he does not like to spend money on razors.

April 27, 2009 Decision of ALJ Krappa

On April 27, 2009, Judge Krappa found that Plaintiff was unable to perform any past relevant work from December 20, 2005 until June, 2006. However, the ALJ determined that, for the period between June, 2006 and April 27, 2009, Plaintiff had the residual functional capacity to perform light work; with a two to three minute stretch break after each hour of sitting; permitting three 15 minute breaks during the workday; requiring only occasional climbing of ladders, ropes or scaffolds, kneeling, or crouching; requiring no crawling; with no exposure to extreme temperatures, wetness,

3

or humidity; and with no undue amounts of dust or chemical irritants. (R. 30) She also limited Plaintiff to simple, unskilled, repetitive, low-stress work requiring only occasional contact with the public and no work in close proximity to others.

Plaintiff's Medical Records

    Heart Disease and Alcohol Dependance

On May 13, 2005, Plaintiff visited Dr. Felix Evangelista due to atrial fibrillation. Dr. Evangelista's impression was Plaintiff had persistent or chronic atrial fibrillation, likely secondary to alcoholism, as well as hypertension and alcoholic liver disease.

On November 29, 2005 was seen at Robert Wood Johnson University Hospital for palpitations. He was alert and in mild distress.(R. 179-188). He reported that he was seen previously on November 24, 2005 but left against medical advice, stating that he needed to follow up with social services. At the time, he reported he had not taken his medicine in three to four days due to not having any money. At the time he was found to be in rapid atrial fibrillation was given a Cardizem IV drip. Plaintiff stated that he had not had an alcoholic drink in a few hours and was anxious.

On November 30, 2005 Plaintiff was found intoxicated, unshaven and unkempt on the side of a road by the police and they brought him to St. Peter's Hospital. Plaintiff told hospital staff that he had drank a quart of vodka. (R. 189). At the time of treatment, Plaintiff indicated to hospital staff that he wanted to be discharged that evening so that he would make it to his appointment at group therapy. (R. 200).

On December 27, 2005, Mr. Pastva was seen by Dr. Yuzefovich, a psychiatrist at University Medicine and Dentistry - University Behavioral Healthcare (UMDNJ-UBHC) for an initial

evaluation. Dr. Yuzefovich diagnosed Plaintiff with major depression, post traumatic stress disorder, alcohol dependence, and a cardiovascular problem. At the time of this evaluation, his GAF was $42^2$.

On May 19, 2006, Plaintiff underwent a cardiac stress test. The results were normal with a calcification level of 60%. On May 23, 2008 Plaintiff had another stress/rest myocardia perfusion scan which indicated that Plaintiff has coronary artery disease, but that there was no evidence of a previous heart attack.

On June 26, 2008 Plaintiff was discharged from St. Peter's University Hospital where he had been admitted for effort induced chest pain which was described as intense. He was diagnosed with nonconstructive coronary heart disease, hypertension and atrial fibrillation secondary to alcoholism. An angiogram performed during that admission revealed an abnormal left ventriculargram.

Chronic Obstructive Pulmonary Disease

On September 29, 2006 Plaintiff was seen by Richard Scalfidi, M.D. for an angio/chest CAT scan. The impression was a pulmonary embolism within left lower lob segmental pulmonary artery. It was noted that a previous embolism had resolved and that this was a new one. A February 15, 2006 chest x-ray showed no acute disease. On April 26, 2007 and November 27, 2005, Plaintiff was treated by Andrew Freedman, M.D. He was diagnosed with chronic obstructive pulmonary disease and was prescribed an inhaler.

Back Pain and Degenerative Disc Disease

A June 23, 2008 MRI revealed degenerative disc changes and disc disease of Plaintiff's lumbar spine, most significantly at L4, L5. This was the result of a cervical spine fusion done in

---

[2] A GAF of 42 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

May of 2000.

Medications

Mr. Pastva's medications include the following: Ativan (anxiety disorders associated with depression, and according to Plaintiff to keep him from drinking); Lexapro, Topamax or Trazodone (for depression); Quinapril (hypertension); Propranolol (hypertension and anxiety) Trazadone (post traumatic stress); and Tenormin (angina). According to Pastva, he has no side effects from his medications other than occasionally feeling drowsy. (R. 94 , 161)

Group Therapy

In 2005, Plaintiff began treating with Lawrence Fisch, of University Behavioral Healthcare and also attended therapy sessions at UMDNJ-UBHC from 2006-2007.

At an initial evaluation on December 27, 2005, Plaintiff arrived for the evaluation "possibly intoxicated" and was noted that his reliability was "poor". He was wearing his 19 year old son's ripped sweat pants and his chest was exposed from a shirt with few buttons. He was unshaven, had slurred speech, and was tearful. He stated that he was disabled due to a heart condition and that his son lived with him in a welfare hotel room on and off and slept on the floor. He presented as disheveled, anxious, depressed, hopeless, and reported flashback and symptoms like post-traumatic stress disorder. He reported being non-complaint with his medications because he couldn't afford them. The functional assessment at that time was that Plaintiff needed assistance in household maintenance, transportation and telephone, and finances. The diagnosis was major depressive disorder (296.30); alcohol dependance; cardiovascular problems; and post-traumatic stress disorder.

In 2006, Plaintiff made minor steps towards sobriety. According to March 27, 2006 treatment notes, Plaintiff's condition had improved and he had stopped binge drinking and abusing

6

prescription drugs for about a month and was attempting to get an alternate support system other than his girlfriend. His grooming was fair, and he was showering and shaving two times a week. Attendance at meetings was sporadic he had missed some sessions in recent weeks. June 25, 2006 treatment notes indicated that Plaintiff was taking charge of his life and that he had one small relapse. He was taking care of personal grooming, washing his clothing and taking care of paperwork for benefits. On September 23, 2006 his attendance at therapy sessions had dropped and that Plaintiff was using a self help center as an alternate support system. Abuse of prescription drug remained in question. He was grooming and shaving three out of seven days. On December 27, 2006 Plaintiff was seen by Dr. Fisch for a three month review. At the time he was maladaptive, coping with depression with binge drinking on a daily basis and abusing prescribed Ativan by increasing dosage on a daily basis. In October, 2007, Mr. Pastva was terminated from the program due to non-compliance with the treatment recommendations. The report noted that Plaintiff did not have any social support, was still residing in a welfare motel.

After terminating treatment with UMDNJ-UBHC, Plaintiff reported that he began treating his psychiatric problems with his primary care doctor, Dr. Chea who prescribes him psychiatric medication.

Consultative Examinations

Anna Maria Resnikoff, Ph.D. conducted a consultative psychiatric evaluation of Plaintiff on February 14, 2006. Dr. Resnikoff reported that Plaintiff has been addicted to pain killers and has been an alcoholic for at least 13 years. He had been sober for 3.5 weeks at the time of the evaluation. He denied suicidal or homicidal ideation. At the time of the evaluation, Plaintiff was fully oriented, although he had a depressed mood. Plaintiff's psychological stresses including the death of his wife,

7

raising his son alone, alcoholism, loss of professional license, inability to cope with depression and symptoms of anxiety, post-traumatic stress disorder symptomology as result of tragedy, unemployment, and financial concerns.  Dr. Resnikoff failed to supply a GAF, apparently in error, but opined "if benefits are to be awarded, a third party would have to be entrusted in order to address the claimant's best interest."

      Dr. Anderson-Wright, D.O. conducted a consultative examination of Plaintiff on February 15, 2006.  The doctor noted that Plaintiff smoked a pack of cigarettes daily, and that Plaintiff had a history of drinking a pint of vodka and two 40 ounce beers per day, but stated that he currently had been sober for 3.5 weeks. On examination, Plaintiff ambulated with normal gait and station, and his lungs had good air exchange, clear breath sounds, and no rales, rhonchi, or wheezes.  He had full muscle strength in all extremities, normal reflexes, intact pulses, and no neurological deficits noted.  Plaintiff had full and active range of motion in all major joint areas including the cervical and lumbosacral spine, and had full use of his upper and lower extremities for fine and gross motor manipulation.  He could walk on his heels and toes, and had no problem getting on and off the examination table. Dr. Anderson-Wright opined that Plaintiff could sit, walk, stand, push, pull, hear, speak, travel, finger, and reach.  However, Dr. Anderson Wright found that due to his abnormal EKG, past medical history for alcohol and pain medication dependance, and an unknown cardiac history, she gave him a very poor functional assessment.

      State agency medical consultant Michael Britton, M.D., reviewed the medical evidence completed a psychiatric review technique and mental residual functional capacity assessment on March 22, 2006.  He stated that Plaintiff's mental impairment was severe, but not expected to last 12 months. He assessed moderate limitations in activities of daily living activities, and his

concentration, persistence, or pace were limited. Specifically, Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions. Further, Dr. Britton found that Plaintiff can not work in proximity with others; complete a normal work day and work week; and interact appropriately with the public.  Dr. Britton reported that he spoke with Dr. Fisch via telephone wherein Dr. Fisch reported Plaintiff was isolative, depressed, diagnosed with major depressive disorder, difficulty maintaining hygiene, with poor energy and lethargy.  Dr. Fisch's prognosis that Plaintiff was a "high-risk" patient.

Interrogatory Responses of Medical Expert (ME), Martin Fechner, M.D.

After a review of the medical evidence of record, Martin Fechner, M.D. completed a follow up set of interrogatories on November 7, 2008 as requested by ALJ Krappa.   ALJ Krappa inserted an introduction to the interrogatories to assist Dr. Fechner in answering the interrogatories. The introduction stated:

> It appears that this case was primarily considered by the agency based upon the alleged mental impairments. An internal CE was done; however, no RFC was prepared. It appears that additional medical exhibits have been added to the file particularly regarding the claimant's apparent heart problems.
>
> I held a hearing in Mr. Pastva's case on July 2, 2008.  Among the physical impairments that were put forth were musculoskelatal problems (cervical and lumbar), coronary artery disease, and hypertension.
>
> While there is a psychological component to the case, I understand that psychiatry is not your area of specialty and do not expect you to opine on any mental health issues.  However, please consider any effect the claimant's substance abuse would have on any physical or psychological symptoms.

In response to the interrogatory number 1, Dr. Fechner noted that Plaintiff had the following impairments: 1) mild chronic obstructive lung disease (with smoking one pack per day); 2) depression and anxiety (treated with Ativan and Lexapro); 3) alcohol addiction (relying on a November 29, 2005 alcohol level); 4) C6-C7 and C5-C6 fusion for herniated discs in May 2000; 5) degenerative changes of the lumbar spine (relying on MRI of June 20, 2008); 6) periodic atrial fibrillation between May and November 2005; 7) periodic chest pain (January 20, 2008); and 8) pulmonary embolus (September 26, 2008).

In response to interrogatory 2, Dr. Fechner found that none of Plaintiff's impairments met or equaled a listing found in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Interrogatories 3 to 10 were answered "non-applicable".

Interrogatory 11 questioned whether substance abuse was material to any of Plaintiff's impairments. Dr. Fechner answered by referring to each impairment listed in interrogatory 1 (above). Dr. Fechner identified three of the eight impairments where alcohol was material – psychological problems, alcohol addiction, and atrial fibrillation. More specifically, Dr. Fechner found as follows:

> 1. Psychological problems. "Definitely alcohol is material. The extent of depression and anxiety can not be adequately determined until alcohol is stopped for four to six months."
>
> 2. Alcohol. "Claimant stated (June 26, 2008) that he had not had a drink since December, 2007. There is no serious liver disease. On September 25, 2006, albumin, bilirubin, AST and ALT were all normal."
>
> 3. Atrial Fibrillation (AF). "Alcohol is material here and is directly related to the fibrillation. No evidence of coronary artery disease, i.e. cardiac catherization (June 26, 2008) is normal and the ejection fraction is 55% (normal) on the same date". (R. 354)

In later interrogatories, Dr. Fechner opined that Plaintiff could undertake most work activities, frequently lifting or carrying up to 10 pounds; occasionally lifting up to 20 pounds; sit, stand, or walking for one hour at a time with a few minutes stretching and break, for a total of six hours each in a work day. He further found that Plaintiff should avoid humidity, wetness, extreme temperatures, and excessive dust and pulmonary irritants. Dr. Fechner signed the interrogatories, and noted that he was an expert in internal medicine.

Hearing Testimony of Martin Fechner, M.D. (ME) and Rocco Meola, Vocational Expert (VE)

At supplemental hearing (February, 2009) Dr. Fechner and Dr. Rocco Meola, a vocational expert, testified. Dr. Fechner's testimony was very brief. He indicated that a person like Plaintiff who abuses alcohol, and then reforms by discontinuing use of alcohol may have some impairments that are not repairable, and this permanent damage can not be evaluated until "two to three to six months" after the use of alcohol ceased and "a little longer for psychological to get better". He indicated that after six months "one would have a much better idea of what the permanent situation is." Dr. Fechner testified that he discussed Plaintiff's depression in his answers to interrogatories, and as an internist, he has worked with alcohol problems. His testimony, in part, was as follows:

> Q.   You indicated that you could determine the extent of his depression, anxiety in Exhibit F — sorry, Exhibit 18F?
>
> A.   Yes, I'm not a psychiatrist, so I didn't want to determine the extent of it to begin with. But I am very familiar, or course, as an internist, and I've worked in the areas with alcohol problems. My only point was that one needed to be off the alcohol for a certain amount of time, probably about six months, five, six months or so in order to be able to determine the severity of any underlying psychiatric problem. (R. 429.)

11

As noted above, Dr. Fechner testified that permanent damages may arise from use of alcohol, but that it takes four or six months after cessation of alcohol to be able to determine the severity of any underlying psychiatric problem.

Dr. Meola testified by answering a hypothetical question posed by the ALJ about whether a person with Plaintiff's impairments could perform jobs that are "simple, unskilled and repetitive and that require no work in close proximity to others to avoid distraction and require only occasional contact with the general public." Dr. Meola testified that a person with those impairments could perform such jobs, and that those jobs are available including "such jobs as sealing machine operator, decalcifier, cleaner, labeler, and weigher would be samples of jobs at the light level that would meet the rest of the limitations within the hypothetical."

Dr. Meola further testified to three additional hypothetical questions. The first additional hypothetical question concerned "depression and the overlay of the physical problems [where] the person has problems with concentration during the work day." Mr. Meola answered that such a person could not work. Then, Dr. Meola was questioned about the same hypothetical person who had "depression and other problems" which would keep him out of work two days a month. Dr. Meola indicated that such a person "is beyond the standard in the industry, and . . . would not be able to do the jobs." Similarly, in answer to the final question, Mr. Meola testified that a person couldn't find work if such a person needed "unscheduled breaks" during the day because he was not feeling well.

IV.

Standard for Evaluation Social Security Disability Cases

A plaintiff is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2)(A); *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin*., 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing.  *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b).

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability.  20 C.F.R. § 404.1520.  First, the plaintiff must establish that he is not currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied.  *See Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)).  In step two, he must establish that he suffers from a severe impairment.  20 C.F.R. § 404.1520(c).  If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.*; *Burnett*, 220 F.3d at 118-20.  If it does, the plaintiff is automatically disabled.  20 C.F.R. §404.1520(d).  But, the plaintiff will not be found disabled simply because he is unable to perform his previous work. In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an

ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning. *Burnett*, 220 F.3d at 119-20. A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review." *Id.* at 119.

If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five. *Plummer*, 186 F.3d at 428. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform [his or] her past relevant work." *Id.*; *see also Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity (RFC); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.

If the plaintiff cannot perform the past work, the analysis proceeds to step five. In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. *See* 20 C.F.R. § 404.1520(g). In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education, and work experience. 20 C.F.R. § 404, subpt. P, app. 2. However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone," because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*,

228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74.

Discussion

In Social Security Disability appeals, usually a plaintiff seeks to reverse the Commissioner's decision by alleging a violation of the five step process for determining disability claims. In this case, Plaintiff's appeal focuses primarily on two different arguments. The first concerns the qualifications of Dr. Fechner, an internal medicine specialist, to act as an expert witness with regard to Plaintiff's psychiatric and orthopedic impairments. The second argument concerns the hypothetical questions posed to the vocational expert by the ALJ. More specifically, the ALJ relied on the answer to only one of the hypothetical questions, without any discussion regarding the answers to the other questions. Each issue is addressed below.

Plaintiff's attorney, Mr. Alter, requests that the testimony of Dr. Fechner's be stricken. He characterizes Dr. Fechner as "house-doctor" who appears virtually all day at the ALJ's offices, and that Dr. Fechner lacks the appropriate expertise needed to evaluate psychiatric impairments. The Court disagrees. First, Dr. Fechner identified himself as an internist both at the hearing and when answering the interrogatories. He testified on the record that he was not a psychiatrist and "didn't want to determine the extent of his [Pastva's] depression". Further, the ALJ was aware that Dr. Fechner was not a psychiatrist, evidenced by the introductory paragraph to the interrogatories sent to Dr. Fechner:

15

> While there is a psychological component to the case, I understand that psychiatry is not your area of specialty and I do not expect you to opine on any mental health issues. However, please consider any effect the claimant's substance abuse would have on any physical or psychological symptoms.

In light of Dr. Fechner's expertise as an internist, he did not do an exhaustive psychiatric evaluation. Instead he observed that depression and anxiety can not be adequately determined until Plaintiff had ceased alcohol use for about three to six months. (See R. 354, 428). The point is that Dr. Fechner did not testify as a psychiatrist, but testified to facts with which internists are familiar. Similarly, Dr. Chea, Plaintiff's primary care physician, treated him for alcoholism by prescribing psychiatric medication. Obviously, Dr. Chea felt that he could treat Plaintiff's alcoholism as a primary care physician. Dr. Chea's treatment and Dr. Fechner's observations about alcoholism confirm that internists may sometimes treat alcoholics as part of their practices.

Mr. Alter further argues that Dr. Fechner lacks experience as an orthopedist and he 'has no medical credentials whatsoever to opine as to Plaintiff's cervical and lumbar disc disease . . . " Mr. Alter argues that Dr. Fechner "has never, in over a generation of private practice, treated any orthopedic injury or impairment other than to bandage a sprain . . ." The Court again disagrees with Mr. Alter's argument. Dr. Fechner only concluded that from a review of the record, Plaintiff's cervical fusion and degenerative changes in the lumbar spine did not meet or equal a listing found in 20 CFR pt. 404, Supbart P, App. 1). Dr. Fechner's testimony primarily concerned Plaintiff's ability to walk, lift, pull and manipulate objects to a certain degree. These observations do not require the expertise of an orthopedist. As such, providing an opinion with regard to the type of physical activity that Plaintiff can perform is within an internist's qualifications.

In sum, Mr. Alter's request that the testimony of Dr. Fechner's be stricken is denied.

However, the Court notes that Dr. Fechner's interrogatory responses and testimony at the hearing give rise to an issue not addressed by either party. In his interrogatory responses, Dr. Fechner noted "the extent of depression and anxiety can not be adequately determined until alcohol is stopped for four to six months."  In addition, he stated "one needed to be off the alcohol for a certain amount of time, probably about six months, five, six months or so in order to be able to determine the severity of any underlying psychiatric problem."  To the Court, this opinion by Dr. Fechner undermines the reports of Dr. Resnikoff and  Dr. Anderson-Wright.  For instance, both Dr. Resnikoff and Dr. Anderson-Wright examined Plaintiff when he was sober for only about 3.5 weeks.  The ALJ does not evaluate Dr. Resnikoff's or Anderson-Wright's opinions in light of Dr. Fechner's caveat about the four to six month sobriety time delay.  As a result, this Court can not determine if  the ALJ relied upon Dr. Resnikoff or Anderson-Wright's opinions, or how ALJ Krappa made her conclusions about Plaintiff's psychiatric impairments when there was no time delayed evaluation.

Plaintiff's second argument is that the ALJ erred by relying only on one of the four answers to the hypothetical questions posed to Mr. Meola, the vocational expert.  More specifically, in answer to the first hypothetical, Mr. Meola found that a person with "depression and the overlay of the physical problems [where] the person has problems with concentration during the work day" could perform jobs that are "simple, unskilled and repetitive and that require no work in close proximity to others to avoid distraction and require only occasional contact with the general public."

However, Mr. Meola's answers to the following hypothetical questions pertaining to the same hypothetical person with "depression and other problems" were not considered.  That is, whether a such a person could work if 1) he required unscheduled breaks because he was not feeling well; (2) he would miss two days of work per month, and (3) he has difficultly concentrating on the work for

the periods required. As noted above, Mr. Meola opined that such a person "is beyond the standard in the industry, and . . . would not be able to do the jobs."

Generally, the testimony of vocational experts in disability determination proceedings includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. *Rutherford v. Barnhart*, 399 F.3d 546, 399 F.3d 546 (3rd Cir. 2005)

The ALJ did not explain why she declined to evaluate the answers to the three additional hypothetical questions when those questions appear to accurately portray Plaintiff's impairments.

ORDER

In conclusion, for the reasons set forth above;

IT IS on this 27TH day of November, 2012;

ORDERED that this matter is remanded to the Commissioner:

1.     For further evaluation in light of Dr. Fechner's opinion that the extent of Plaintiff's depression and anxiety can not be adequately determined until alcohol is stopped for four to six months; and

2.     For further evaluation of all of Mr. Meola's responses to the hypothetical questions posed at the supplemental hearing of February 11, 2009.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.
